234 N.J. Super. 526 (1989)
560 A.2d 1353
JEWISH FEDERATION OF CENTRAL NEW JERSEY, PLAINTIFF,
v.
GERSON BARONDESS, DEFENDANT.
Superior Court of New Jersey, Law Division Special Civil Part, Union County.
Decided March 1, 1989.
Sanford Halberstadter, attorney for plaintiff, Jewish Federation of Central New Jersey.
Lisa A. Fagan, (Abrams, Blatz, Gran, Hendricks, Reina & Ritz, attorneys) for defendant, Gerson Barondess.
*527 MENZA, J.S.C.
This matter is before the Court for trial on stipulated facts.
The issue is whether the Statute of Frauds may serve as a defense to a claim to enforce a charitable pledge. There are no New Jersey cases which have addressed this precise issue.
The defendant has made a charitable pledge to the plaintiff in the sum of $2,000, which the defendant now refuses to pay. Plaintiff has brought suit for $4,000, which the defendant agrees to pay if there is a judgment in favor of the plaintiff. Defendant defends on the basis that the pledge is unenforceable because of the one year provision of the Statute of Frauds.[1]
The great bulk of the jurisdictions, including New Jersey, hold that a charitable pledge constitutes an enforceable contract. See generally Restatement (Second) of Contracts, Sec. 90 (1981); Annotation, "Consideration for subscription agreements." 115 A.L.R. 589 (1938). There are various theories as to why this is so:
Some courts have found consideration on the theory that the donee impliedly promises to use the promised gifts for charitable purposes.... Other cases have found consideration in the purported exchange of promises between the subscribers.... Other cases have held that the subscription is an offer to a unilateral contract which is accepted by the charity's performance of the terms of the subscription.... Of late, some courts have tended to abandon the attempt to utilize traditional contract doctrines to sustain subscriptions and have placed their decision on grounds of promissory estoppel. [J. Calamari and J. Perillo, The Law of Contracts, 207-208 (1977).]
One would be hard-pressed, however, to find either consideration for the subscriber's promise or a reliance on that promise by a charity. With regard to whether there is consideration, Williston states:
The very term "charitable subscription" indicates that the subscriber's promise is made as a gift and not in return for consideration. There is no bargain between the parties. Even if one were attempted it is open to doubt whether *528 the acceptance or promise to accept a pure benefit  as a sum of money  can legally be sufficient consideration for a promise to confer the benefit; but this point need not be troublesome because no bargain of the sort is contemplated. [S. Williston, A Treatise on the Law of Contracts, Sec. 116 (3 Ed. 1957).]
In the Restatement, the authors state:
American courts have traditionally favored charitable subscriptions ... and have found consideration in many cases where the element of exchange was doubtful or non-existent. [Restatement (Second) of Contracts, Section 90, Comment f (1981).]
Reliance is also a questionable basis for enforcing a charitable subscription. That is because in reality, a charity does not rely on a particular subscription when planning its undertakings. (Clearly, Jewish Federation of Central New Jersey did not undertake any projects based on the defendant, Barondess's, pledge of $2,000).
The authors, Calamari and Perillo recognize the wobbly underpinnings of the reliance concept:
... detrimental reliance is difficult to prove. Under previous holdings, despite the conceptual inadequacy of the reasoning, promises were frequently enforced without regard to detrimental reliance on the promise.... If enforcement of charitable subscriptions is a desireable goal, it would seem sounder to view the preponderance of cases as supporting the proposition that a charitable subscription is enforceable without.... detrimental reliance. [J. Calamari and J. Perillo, The Law of Contracts, 208-209 (1977).]
The real basis for enforcing a charitable subscription is one of public policy  that enforcement of a charitable subscription is a desirable social goal. The New Jersey Supreme Court has in fact recognized public policy as the rationale of enforcement of charitable subscriptions.
In More Game Birds in America, Inc. v. Boettger, 125 N.J.L. 97, 100-101 (E. & A. 1942), the court stated:
In England, a charitable subscription has not, in itself, been considered as creating a binding obligation. The law in most of the courts of our states is to the contrary. Charitable subscriptions have been supported by sufficient consideration on various grounds.... A careful study of the cited decisions and many others to like effect, together with opinions of text writers on the subject, impels the conclusion that public policy forms the basis upon which consideration is spelled out in order to impose liability on charitable subscriptions. [emphasis added.]
*529 If a charitable subscription is disguised as a contract in order to effectuate a public policy, logic would dictate that the law should not then permit the institution of a contractual defense to undermine that policy. That is not to say that there are not some defenses to a claim on a charitable subscription. There may very well be. But the Statute of Frauds is not one of them. The purpose of the Statute of Frauds is to prevent the enforcement of unfounded or fraudulent claims. It would be absurd therefore to permit the Statute of Frauds to be used as a defense to an admitted charitable pledge which the Court has only characterized as a contract in order to insure that it is enforced.
There is also a practical reason for enforcing charitable subscriptions:
Lightly to withhold judicial sanction from such obligations would be to destroy millions of assets of the most beneficent institutions in our land, and to render such institutions helpless to carry out the purposes of their organization. More Game Birds In America Inc. v. Boetteger, 125 N.J.L. at 100-101; [emphasis added.]
Lastly, this Court feels that Williston's comments are appropriate to this case:
Much of (the) litigation (regarding the statute of frauds) comes from the attempt to enforce honestly made contracts against dishonest parties who choose to welsh on their agreements by hiding behind a Statute which was originally designed to prevent "Frauds and Perjuries," and which, over the years, has become warped and tested by misconception and misapplication. [3 S. Williston, A Treatise on the Law of Contracts, Sec. 448 (3 ed. 1957).]
Judgment for the plaintiff in the sum of $4,000.00.
NOTES
[1] N.J.S.A. 25:1-5. Promises or agreements not binding unless in writing ... (e) An Agreement that is not to be performed within one year from the making thereof.